# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

N⁰ 06-CV-1016 (JFB)(MLO)
_____

JOSEPH A. PISANI,

Plaintiff,

VERSUS

STATEN ISLAND UNIVERSITY HOSPITAL AND
ANTHONY C. FERRERI,

Defendants.

_____

MEMORANDUM AND ORDER
April 15, 2008
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Joseph A. Pisani ("plaintiff" or "Pisani") brought this action on September 21, 2005 for defamation and defamation *per se* against Staten Island University Hospital ("SIUH" or the "Hospital") and Anthony C. Ferreri ("Ferreri") in his individual and official capacity (collectively, "defendants"),[1] arising out of a statement the Hospital issued on May 18, 2005 (the "Hospital's statement" or the "statement"). By Memorandum and Order dated May 31, 2006 (the "May 31 Order"), the Court denied defendants' motion to dismiss the complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6). Presently before the Court is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, defendants' motion is denied.

## I. FACTS

The Court has taken the facts described below from the parties' depositions, affidavits, exhibits, and respective Local Rule 56.1 statements of facts.[2] Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See*

_____

[1] Patrick F. McDermott was also a defendant in this action, but plaintiff dismissed all claims against him on December 13, 2007.

[2] Where only one party's Rule 56.1 statement is cited, the opposing party does not dispute that fact or has offered no evidence to controvert that fact.

*Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2001).

### A. The Parties

#### (1) The Hospital

SIUH is a tertiary care, teaching healthcare system. (Defs.' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1") ¶ 6.) The Hospital's principal place of business is Staten Island, New York. (Defs.' 56.1 ¶ 7.)

#### (2) Ferreri

Ferreri was a member of the Hospital's Board of Trustees between 1995 and 2001, an Executive Vice President of the Hospital between 2001 and 2003, and has been the Hospital's President and Chief Executive Officer since then. (Defs.' 56.1 ¶ 8; Ferreri Dep. at 6-7.)

#### (3) Pisani

SIUH hired Pisani in January 1994. (Defs.' 56.1 ¶ 2.) He served as the Hospital's Executive Vice President of Corporate Services from 1995 through 2000. (Defs.' 56.1 ¶ 3.) Pisani voluntarily resigned in or about June 2000, but remained on the payroll until the end of the year. (Defs.' 56.1 ¶ 5.)

### B. The Attorney General's Office Investigation and Settlement

According to Arthur J. Fried ("Fried"), the Hospital's General Counsel, the New York State Attorney General's Office (the "AG") was investigating issues related to CHAPS Community Health Services, Inc. ("CHAPS") clinics – for which SIUH was responsible – as of 2003. (Defs.' 56.1 ¶ 62; Fried Dep. at 19.) The period covered by this investigation was

roughly January 1, 1999 through the clinics' closure in 2004. (Plaintiff's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1") ¶ 184.)

In February 2005, the Hospital "began to talk in specific detail" with the AG about a resolution of the investigation. (Fried Dep. at 96.) In particular, according to Fried, the AG "transmitted to [the Hospital] . . . an outline of what would have to be in settlement of the investigation, and then a detailed draft of a settlement agreement." (Fried Dep. at 99.) The outline mandated that SIUH enter into an agreement with the AG in settlement of a civil complaint that the AG was going to file related to the CHAPS clinics, as well as that SIUH issue a "'statement of contrition and an admission of wrongdoing.'" (Fried Dep. at 100-01 (quoting outline, or settlement "term sheet" from AG).)

On May 17, 2005, the Hospital's Board (the "Board") scheduled a meeting in order to discuss and vote on formally agreeing to the settlement that the Hospital's counsel and management had negotiated. (Defs.' 56.1 ¶ 116.)

The Hospital entered into a settlement agreement with the AG on May 17, 2005 (the "settlement agreement"), the same day that the AG filed the aforementioned civil complaint (the "AG complaint"). (Defs.' 56.1 ¶ 15.)

Fried testified regarding the Hospital's motivation in assenting to the settlement agreement:

> The decision that the Board made was that it was far more beneficial to the hospital to enter into that settlement agreement than litigate and

perhaps ultimately be liable for far more in damages after a far uglier litigation than what ultimately occurred.

(Fried Dep. at 170-71.)

In another exchange with plaintiff's counsel on this topic, Fried further stated:

And on May 17, given all of the factors, the pluses and minuses, the Board chose what they considered to be the better course for the hospital was to approve the settlement agreement with the statement of contrition.

(Fried Dep. at 172-73.)

(1) Press Release

On May 18, 2005, the AG published a press release on the AG's website (the "press release"). (Defs.' 56.1 ¶ 10.) The press release stated, *inter alia*:

Attorney General Eliot Spitzer today announced that [SIUH] has agreed to repay taxpayers $76.5 million to resolve allegations that the hospital fraudulently overbilled the Medicaid program for services provided at 21 clinics and that it also caused the state to pay a wrongly inflated reimbursement rate for patient visits at more than 500 clinics over a three-year period.

According to a Complaint, filed yesterday in connection with the settlement, SIUH and CHAPS Community Health Services, Inc. ("CHAPS") fraudulently billed for services at 21 part-time clinics. To encourage hospitals to deliver services to Medicaid patients in remote or underserved communities, New York State paid them an enhanced rate to operate part-time clinics. For providing services in these clinics – up to 60 hours per month – Medicaid paid physicians as much as eight times the rates for the same services provided in other settings.

According to the Complaint, beginning in 1999, at a time when SIUH was facing severe financial shortfalls, the hospital embarked upon a fraud consisting of knowingly billing Medicaid at the premium part-time clinic rate for thousands of hours of services delivered in clinics that were not truly part-time clinics.

(Press Release at 1 (Defs.' Exh. 11).)

(2) The Hospital's Statement

The Hospital's statement appeared on the same webpage as the press release on the AG's website. (Statement at 1 (Defs.' Exh. 11).) The Hospital's statement provided, *inter alia*:

Today the New York State Attorney General's Office announced a settlement recovering unlawful Medicaid

reimbursements to [SIUH]. The settlement is based on actual damages conservatively estimated by the Attorney General's Office . . . with significant weight given to the hospital's financial inability to pay more than what has been agreed to.

It causes SIUH's Trustees and current Executives much pain to come before our community in these circumstances. We deeply regret and are embarrassed by the misconduct carried out by former executives of the Hospital that led to this settlement. . . .

We recognize that the hospital bears great responsibility for conduct that resulted in the receipt of substantial amounts in state reimbursement to which we were not entitled. We humbly pledge to work conscientiously to keep SIUH from ever again bringing such dishonor to the hospital.

(Hospital's statement (Defs.' Exh. 11).)

### (3) The AG Complaint

On the same webpage as the press release and the Hospital's statement was a link to the AG complaint. (Defs.' Exh. 11.) Plaintiff was not named as a defendant in the AG complaint, which was dated and filed on May 17, 2005. (*See* AG Complaint ¶¶ 3-5 (Defs.' Exh. 12); Defs.' 56.1 ¶ 15.) The only named defendants in the AG complaint are SIUH and CHAPS. (*See* AG Complaint ¶¶ 3-5 (Defs.'

Exh. 12).) However, the AG complaint contains factual allegations that specifically name Pisani, as follows:

1. Staten Island University . . . defrauded New York State of millions of dollars through a sophisticated overcharging scheme, taking advantage of a Medicaid program designed to encourage medical care in underserved, usually poor neighborhoods . . . .

2. From 1989 to July 2000, the President and Chief Executive Officer of SIUH was Americo 'Rick' Varone. Joseph Pisani was Executive Vice President of SIUH until the end of 2000 . . . . Numerous other SIUH officers and employees also had knowledge of the violations described in this [c]omplaint.

\* \* \* \*

22. A report dated March 18, 1999, which was forwarded to CEO Varone and Executive Vice President Pisani, stated that each of the Levit clinics described . . . was operating in violation of . . . regulations.

23. At the same time . . . a lawyer wrote a memorandum to file to memorialize a conversation with Joseph Pisani, the Executive Vice President of SIUH. The lawyer reported learning that a clinic was operating on a full-time basis and calling Pisani to

tell him he had to "roll back the hours" of the clinic. The memorandum stated that, if he did not, "he jeopardizes all Medicaid billing of the [clinic]." Pisani's response was recorded: "He told me that he would not do so because he could not operate an UrgiCenter on a part-time basis even though that's what it legally is." The clinic continued to operate – and bill Medicaid – in violation of the regulations.

* * * *

25. . . . A May 15, 1999 memo to a SIUH Vice President from a SIUH administrator who inspected the clinics updated reports on Dr. Levit's clinics, noting . . . violations of the hours of operation regulations . . . .

26. That memo came to CEO Varone on May 18, 1999, with a copy to Executive Vice President Pisani . . . . Despite acknowledging this warning, and purporting to approve changes to the operations of the clinics, Varone and Pisani in fact did nothing to prevent the clinics from operating in excess of the part-time clinic regulations.

* * * *

44. The acts and practices alleged herein constitute conduct proscribed by §

63(12) of the Executive Law, in that defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

(*Id.* ¶ 11.)

(4) Settlement Agreement

In addition to the AG complaint, the webpage containing the press release and the Hospital's statement contained a link to the settlement agreement. (Defs.' Exh. 13.) The stated purpose of the settlement agreement was to "resolve all issues in the Complaint and otherwise identified by the . . . investigation. . . ." (Defs.' Exh. 13 at 2.) The settlement agreement also contains the following provision: "SIUH neither admits or denies the conduct set forth in the Complaint." (Defs.' Exh. 13 at 2.)

C. Defendants' Role in Drafting the Hospital's Statement

As set forth below, the parties dispute the role defendants played in determining the text of the Hospital's statement. In particular, defendants state that the Hospital "never specifically agreed to a statement of contrition. It agreed to a settlement with the AG's Office, and was advised by the AG that signing a statement of contrition was a requirement of settlement." (Defs.' 56.1 ¶ 105.) Defendants emphasize that the "AG drafted the original version of the Statement, including the word 'misconduct,' although the Hospital was able to negotiate some of the other terms." (Defs.' Mem. at 4.) In opposition, Pisani underscores that "the numerous versions of the Statement and emails related thereto over the course of four

or five months support the fact that the hospital had input into that statement as part of the overall settlement negotiations." (Pl.'s Resp. to Defs.' 56.1 ¶ 21.) Set forth below are the portions of deposition testimony and other supporting evidence relevant to this dispute.

As a threshold matter, according to Fried, the "first draft of the statement of contrition was provided by the Attorney General's Office as an attachment to the initial draft settlement agreement." (Fried Dep. at 117.) Fried further explained that "after the initial document was provided by the Attorney General's Office, all subsequent drafts were made by [SIUH] or representatives of [SIUH], provided to the Attorney General's Office, and then we would have a discussion with them about the language and subsequent to that discussion revised it." (Fried Dep. at 119.) At his deposition, Ferreri also testified that "[t]here were discussions regarding the statement of contrition after received by the Hospital's attorneys, there were discussions, I don't recall if it was on conference calls or in person, there were discussions that I had with counsel relative to the language and we did present alternatives to the Attorney General." (Ferreri Dep. at 36.) At his deposition, Ferreri agreed that he was "involved in this interchange regarding proposing to the Attorney General the language for the statement of contrition. . . ." (Ferreri Dep. at 38.) However, he also stated that he did not have "direct involvement" in negotiations with the AG regarding this statement. (Ferreri Dep. at 36.)

(1) Correspondence Pertaining to the Hospital's Statement

Fried agreed that the following text represented the initial draft of the Hospital's statement proposed by the AG:

The Officers and Trustees of [SIUH] express deep regret for the misconduct that led to this settlement with the State of New York. Through actions and failures to take action, former SIUH employees and officers engaged in a course of conduct that led to SIUH misappropriating tens of millions of dollars from the People of the State of New York. This conduct was inconsistent with the policies of SIUH and contrary to the values of SIUH's other hardworking employees.

The corporate culture that exploited the Medicaid Program has ended. The business and corporate governance reforms and practices that SIUH has agreed to abide by today are consistent with SIUH's desire to be a national model for compliance. . . .

(Fried Dep. at 122-23; Pl.'s Exh. 7.)

Moreover, Fried characterized a series of subsequent email communications among SIUH employees and with the AG as "compris[ing] many, if not all of the various drafts of the statement of contrition back and forth between the executive to the hospital, its counsel, and the staff to the Attorney General's office." (Fried Dep. at 117-18.) The Court sets forth certain of these communications below.

On February 16, 2005, a draft of the Hospital's statement was circulated among SIUH representatives and lawyers – including

6

Ferreri – that, according to Fried, represented the Hospital's modifications to the AG's initial draft. (Fried Dep. at 120; Pl.'s Exh. 8 at D618.) This draft stated, in relevant part:

> The officers and trustees of [SIUH] deeply regret the misconduct carried out by former employees of the Hospital that led to the settlement announced today by the [AG] regarding Medicaid billing activity.
>
> We recognize that the hospital bears responsibility for the conduct of its previous employees in their misappropriation of tens of millions of dollars in state reimbursement related to outpatient clinic services. Their actions are contrary to the values of the Hospital's Board of Trustees, [and] its current administration . . . .

(Pl.'s Exh. 8 at D620.)[3]

On February 17, 2005, another draft was circulated among Hospital representatives and lawyers – including, again, Ferreri. (Pl.'s Exh. 8 at D629.) This draft stated, in relevant part:

> The officers and trustees of [SIUH] deeply regret the misconduct carried out by former officials of the Hospital that led to the settlement announced today. . . .
>
> We recognize that the Hospital bears responsibility for this conduct that resulted in misappropriation of tens of millions of dollars. . . .

(Pl.'s Exh. 8 at D630.)

Also on February 17, 2005, Fried sent a draft of the Hospital's statement to the AG by email and copied, among others, Ferreri. This draft stated, in part:

> The officers and trustees of [SIUH] deeply regret the misconduct carried out by former executives of the Hospital that led to the settlement announced today. . . .
>
> We recognize that the Hospital bears responsibility for this conduct that resulted in misappropriation of tens of millions of dollars. . . .

(Pl.'s Exh. 8 at D634.)

On February 25, 2008, Fried circulated a further "stab at the statement of contrition" to SIUH representatives and lawyers, including Ferreri. (Pl.'s Exh. 8 at D636.) This draft stated, in relevant part:

---

[3] Fried explained at his deposition that the dates appearing at the top of each draft of the Hospital's statement may not be accurate. (Fried Dep. at 119.) Thus, the Court relies on Fried's testimony and the dates of email correspondence in an attempt to place each draft in chronological order. In any event, the precise chronology of the drafts is, as discussed *infra*, less important than (1) the fact that the drafting process occurred and how extensive it was; and (2) the difference between the AG's initial draft and the Hospital's ultimate statement.

It causes SIUH's Trustees and Executives much pain to come before our community in these circumstances. We deeply regret the misconduct carried out by former executives of the Hospital that led to this settlement. We are embarrassed by the wrongful behavior of these trusted employees. Hospital leadership is committed to ensuring that none of our successors need repair the damage of unlawful conduct that places the well being of this community in jeopardy. . . . We can also assure you that as far as we know, the wrongdoers are no longer at the hospital – our current employees were not participants in any misconduct. . . .

SIUH has not been served well by the handful of individuals whose conduct is responsible for us being in this position. . . .

These patients, and the hospital's employees, are victims of the individuals whose improper conduct deserves to be punished. . . .

(Pl.'s Exh. 8 at D637.)

On February 26, 2005, another draft was circulated among the Hospital's representatives and lawyers, including Ferreri. This draft, in relevant part, stated the following:

It causes SIUH's Trustees and current Executives much pain to come before our community in these circumstances. We deeply regret and are embarrassed by the misconduct carried out by former executives of the Hospital that led to this settlement. . . .

We recognize that the Hospital bears great responsibility for conduct that resulted in misappropriation of substantial amounts in state and federal reimbursement. We humbly pledge to work conscientiously to keep from ever again bringing such dishonor to our community.

(Pl.'s Exh. 8 at D639.)

On February 26, 2005, Ferreri wrote the following email among the Hospital's representatives and lawyers:

I missed this in my earlier review but the last sentence, although intended as a promise to avoid **"again bringing"** dishonor to our community, literally states that **"We"** (the current leadership) were responsible for bringing dishonor to our community. (*We* humbly pledge to work conscientiously to keep from *ever **again** bringing* such dishonor to our community").

(Pl.'s Exh. 8 at D642) (emphases in original). At his deposition, Ferreri explained that he wrote this email because "there would be a concern that the same culture that was responsible for these acts in violation of state regulation were still present in the organization." (Ferreri Dep. at 40.)

8

Later that day, Fried circulated a draft revising, *inter alia*, the sentence to which Ferreri referred in his email to state: "We humbly pledge to work conscientiously to keep [SIUH] from ever again bringing such dishonor to our community." (Pl.'s Exh. 8 at D646.) Ferreri then wrote another email to the same group, stating: "Content seems to cover government's expectations. . . ." (Pl.'s Exh. 8 at D651.)

On February 27, 2005, SIUH sent a draft of the Hospital's statement to the AG that was, in relevant part, identical to the draft circulated on February 26, 2005, including the revision that Ferreri had suggested in his email. (Pl.'s Exh. 8 at D 655-56.)

On May 11, 2005, Fried circulated a draft of the Hospital's statement that was "revised after our conversation with the AG Staff." (Pl.'s Exh. 8 at D659.) This draft was substantially identical to the draft SIUH had sent to the AG. (Pl.'s Exh. 8 at D660.)

(2) Defendants' Advance Knowledge of the Executives Named in the AG Complaint

As set forth below, the parties dispute whether defendants knew of the contents of the AG complaint prior to finalizing the statement, including the identities of the particular executives named in the complaint.

Defendants contend that "[a]t the time the Hospital finalized the statement of contrition, the Hospital did not know that individuals were named in the AG's Complaint." (Defs.' 56.1 ¶ 111.) Defendants emphasize that "[n]either the Hospital nor its lawyers were given the AG's Complaint in either draft or final form, prior to the terms of the settlement agreement being agreed to by the Hospital's negotiators" and that the "Hospital's lawyers were permitted to read the Complaint or a draft thereof only at around 4 p.m. the day

before the Settlement was formally accepted by the Hospital's board, and after the AG's negotiators advised that they would not accept any changes in the settlement terms or the Statement." (Defs.' 56.1 ¶ 17-18.)

Similarly, at his deposition, Ferreri stated that he had "no knowledge" – prior to the May 2005 meeting at which the Hospital's Board decided to accept the settlement with the AG – that the AG was going to name particular executives in the AG complaint. (Ferreri Dep. at 44.) He could not "recall when [he] learned of the individuals who were named." (Ferreri Dep. at 44.) Ferreri testified that "prior to agreeing" to the Hospital's statement, he "did not know the identities [of the people named in the complaint], didn't even know if anyone would be named." (Ferreri Dep. at 45.) Specifically, Ferreri stated: "I could tell you definitively that I was not aware of the individuals at the time of the – that I agreed to the settlement and the contrition." (Ferreri Dep. at 46.)

Plaintiff, however, points to the deposition testimony of Fried, in which he states that he and others read the AG complaint on May 16, 2005, the day before the Hospital executed the settlement agreement:

> I believe on Friday, it would have been the 13[th], the Attorney General advised us that counsel for the hospital and the Board could come in on the afternoon of the 16[th], you know, after the settlement had been negotiated in its final form, and was to be presented the next morning for an up or down vote by the board, and to read the complaint solely for the purposes of advising the Board the next morning as to the settlement proposal that was before them – settlement

agreement that was before them.

\*\*\*

I went and Herve went and Keith Thompson went. . . . We reviewed the complaint that was given to us by the Attorney General's staff.

(Fried Dep. at 141, 143.)

Fried further testified that prior to the Board's meeting on May 17, 2005, he informed Ferreri and others that Pisani was named in the AG complaint. (Fried Dep. at 149.) However, Fried stated that he could not recall whether the Board was advised that Pisani was named. (Fried Dep. at 155.)

### (3) Defendants' Understanding Regarding the AG's Intended Use of the Hospital's Statement

As set forth below, the parties dispute the extent of defendants' knowledge that the AG was going to republish the statement.

Ferreri testified that he did not have "an understanding as to what was going to be done with the statement of contrition." (Ferreri Dep. at 40.) He "had no idea what was going to be done with it." (Ferreri Dep. at 41.) Fried also testified that he "didn't know what the Attorney General was going to do with" the Hospital's statement. (Fried Dep. at 166.) He testified that no member of the SIUH legal team asked the AG of its intentions with the Hospital's statement because "[w]e didn't see any reason to ask. It never occurred to us to ask." (Fried Dep. at 167.)

However, in response to counsel's inquiring whether Fried was concerned that the AG might publicize the Hospital's statement, Fried stated:

We would have preferred that none of this become public, but we knew that that was an unlikely event. We had – actually, the Attorney General's Office had asked for, that all of this be I guess embargoed on behalf of [SIUH].

On May 17 the Attorney General was going to make whatever public statement or release it was going to make and we knew we would be responding to that and that was – you know, we were waiting to see what the AG would do, what reaction there was going to be to that, and then we would base our reaction on that and we were, we knew what the possibilities were and we were prepared to address them.

(Fried Dep. at 167-68.)

## II. PROCEDURAL HISTORY

Plaintiff filed his original complaint on September 22, 2005, in the United States District Court for the Southern District of New York. On January 19, 2006, defendants filed a motion to dismiss and/or transfer venue. The action was transferred to the Court pursuant to 28 U.S.C. §1404(a), by Order dated February 27, 2006, based upon the parties' consent to a change in venue. As stated *supra*, the Court denied defendants' motion to dismiss the complaint in the May 31 Order.

Defendants filed the instant motion on November 16, 2007. Plaintiff responded on December 12, 2007. Defendants replied on January 11, 2008. The Court held oral argument on March 11, 2008. The parties each wrote a letter to the Court on March 12, 2008 regarding a legal issue raised at oral argument.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156,

160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

### IV. DISCUSSION

An action for defamation that is expressed in writing or print is the common law cause of action of libel. *See Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001). The elements of libel under New York law are: (1) a false and defamatory statement of fact concerning the plaintiff; (2) that was published by the defendant to a third party; (3) due to the defendant's negligence (or actual malice, depending on the status of the person libeled); and (4) special damages or "*per se*

actionability."[4]  *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 176 (2d Cir. 2000).

Defendants move for summary judgment on the following grounds: (A) SIUH is not liable for the AG's republication of the Hospital's statement; (B) the Hospital's statement was a statement of non-actionable opinion, and not fact; (C) defendants did not have the requisite intent to give rise to a defamation claim; and (D) plaintiff has not shown special damages.  Separately, defendants argue that the Court should dismiss all claims against Ferreri.  For the reasons set forth below, the Court rejects each of these arguments.

## A. Republication

Defendants argue that they are not liable for the AG's republication of the Hospital's statement on the AG's website and, therefore, plaintiff cannot meet the second element of a cause of action for defamation, *i.e.,* publication of the allegedly defamatory statement to a third party.  In opposition, plaintiff argues that defendants are responsible for any reasonably foreseeable republication of their allegedly defamatory statement.  For the reasons set forth below, the Court disagrees with the standard plaintiff proposes relating to liability for republication.  However, after careful review of the record in this case according the proper standard – that is, the standard proposed by defendants – the Court finds that defendants' responsibility for the republication of the Hospital's statement

is a genuine issue of material fact that precludes summary judgment.

The Second Circuit has held that "a plaintiff may not recover damages from the original author for . . . slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication."  *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002); *see also Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 670-71 (S.D.N.Y. 2007) (noting that "republication of the defamatory material by a third party cannot be attributed to the original publisher . . . absent a showing that the original author was responsible for or ratified the republication. . . ."); *Croton Watch Co., Inc. v. Nat'l Jeweler Magazine, Inc.*, No. 06-CV-662, 2006 U.S. Dist. LEXIS 55753, at *19 n.6 (S.D.N.Y. Aug. 7, 2006) ("Anyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damages caused by the publication.") (citation and quotation marks omitted); *Croy v. A.O. Fox Mem'l Hosp.*, 68 F. Supp. 2d 136, 144 (N.D.N.Y. 1999) ("The original author of a document may not be held personally liable for injuries arising from its subsequent republication absent a showing that the original author approved or participated in some other manner in the activities of the third-party republisher."); *Cerasini v. Sony Corp.*, 991 F. Supp. 343, 351-52 (S.D.N.Y. 1998) ("Thus, a libel plaintiff must allege that the [defendant] had authority or control over, or somehow ratified or approved, the republication.") (collecting cases); *Rubenstein v. Manhattan and Bronx Surface Operating Auth.*, No. CV-96-902, 1997 U.S. Dist. LEXIS 16661, at *16-*17 (E.D.N.Y. Oct. 8, 1997) ("The defendant is correct in that as a general rule New York State law does not render the original publisher of a defamatory statement automatically liable for subsequent

---

[4] As stated *infra*, plaintiff alleges defamation and defamation *per se*.  The elements of the two claims are identical except that a claim of defamation *per se* does not require proof of special damages.  *See Friends of Falun Gong v. Pacific Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 284 n.4 (E.D.N.Y. 2003) ("The only requirement the plaintiffs need not fulfill in a defamation *per se* claim is proof of special damages.").

republications of the statement by others. However, an original publisher will be liable for the republication of his libelous statement if he gave a statement to a representative of a newspaper authorizing or intending that it be republished.") (citations and quotation marks omitted); *Johnson v. Shearson Loeb Rhodes, Inc.*, No. 03 Civ. 3937, 1984 U.S. Dist. LEXIS 22683, at *16-*17 (S.D.N.Y. Oct. 18, 1984) ("Under the law of New York . . . the original publisher of a defamatory statement is not automatically liable for subsequent republications of the statement by others. Shearson, therefore, could not be held responsible for repetition of its alleged defamatory statements absent an allegation that it participated in or approved the republication.").[5]

According to this standard of liability set forth by the Second Circuit, and under the circumstances of this case, the Court finds that defendants' responsibility for the republication of the Hospital's statement is a genuine issue of material fact that warrants a trial. Specifically, although defendants contend that they did not know what the AG would do with the Hospital's statement, Fried's testimony that "[w]e would have preferred that none of this become public, but we knew that that was an unlikely event" creates, at a minimum, some ambiguity on this

subject. As stated *supra*, the foreseeability of the AG's republication of the statement is insufficient as a matter of law to make defendants responsible for such publication. However, the Court reads Fried's testimony in conjunction with the evidence regarding (1) the evolution of the language of the Hospital's statement; and (2) the Hospital's advance notice of Pisani's identification in the AG complaint. After reviewing this evidence in the context of the entire record, the Court finds that a genuine issue of material fact regarding defendants' liability for the statement's republication remains and warrants a trial.

In particular, the text of the statement changed, in relevant part, from

> The Officers and Trustees of [SIUH] express deep regret for the misconduct that led to this settlement with the State of New York. Through actions and failures to take action, former SIUH employees and officers engaged in a course of conduct that led to SIUH misappropriating tens of millions of dollars from the People of the State of New York. . . .

to

> It causes SIUH's Trustees and current Executives much pain to come before our community in these circumstances. We deeply regret and are embarrassed by the misconduct carried out by former executives of the Hospital that led to this settlement. . . .

---

[5] As stated *supra*, plaintiff urges the Court to apply a more lenient standard – reasonable foreseeability – to analyze the republication issue. The Court is aware that certain state and district courts within this Circuit have applied that standard, *see, e.g., Denaro v. Rosalia*, No. 19512, 2007 NY Slip Op 52493U (Queens County Dec. 17, 2007), but the Court is persuaded –based upon the Second Circuit's decision in *Fashion Boutique of Short Hills* and those of the majority of the district courts in this Circuit that have addressed the issue – that the proper standard relates to control, ratification, approval, and/or participation in the republication.

As a threshold matter, the Court notes that the Hospital's statement is explicitly targeted at "the community." This direct reference to the community – as opposed to the AG – is reasonably susceptible to the inference that defendants intended the statement to be disseminated to the public. Further, although the AG's first draft does not specifically state who or what engaged in "misconduct," the Hospital's final draft squarely states that the "misconduct" was "carried out by former executives of the Hospital." Defendants' control over the drafting process on such a key issue – the characterization of the acts that gave rise to the settlement agreement, including their attribution to particular people – reflects a genuine issue of material fact regarding defendants' control over the republication in general. In particular, a reasonable factfinder considering both the evolution of the statement's language and Fried's testimony – in the context of the case overall – could find that defendants approved, ratified, or controlled this republication. Therefore, the Court declines to grant defendants summary judgment on this ground.

B. Fact vs. Opinion

As the Second Circuit has repeatedly confirmed, "New York law absolutely protects statements of pure opinion, such that they can never be defamatory." *Kirch v. KGL Pool GmbH*, 449 F.3d 388, 402 (2d Cir. 2006) (citation and quotation marks omitted). Defendants argue that the Hospital's statement was one of pure opinion and, thus, cannot give rise to a cause of action for defamation. As set forth below, however, the Court disagrees with defendants and finds as a matter of law that the Hospital's statement was one of fact, and not opinion.[6]

"Categorizing a defendant's statements as either fact or opinion . . . is often not an easy task. As one commentator has noted, 'No area of modern libel law can be murkier than the cavernous depths of this inquiry.'" *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997) (quoting Sanford, *Libel and Privacy* § 5.1 (Supp. 1997)). Nevertheless, the "burden rests with the plaintiff to establish that in the context of the entire communication a disputed statement is not protected opinion." *Celle*, 209 F.3d at 179.

"As an initial matter, the inquiry into whether a statement should be viewed as one of fact or one of opinion must be made from the perspective of an ordinary reader of the statement." *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985) (citation and quotation marks omitted); *see also Dworin v. Deutsch*, No. 06 Civ. 13265, 2008 U.S. Dist. LEXIS 13655, at *10-*11 (S.D.N.Y. Feb. 22, 2008) ("The question is one of law for the court and one which must be answered on the basis of what the average person hearing or reading the communication would take it to mean.") (citation and quotation marks omitted); *Whitney Info. Network, Inc. v. Weiss*, No. 06-CV-6569, 2008 U.S. Dist. LEXIS 21223, at *7 (E.D.N.Y. Mar. 18, 2008) ("The dispositive inquiry in this regard is whether a reasonable listener . . . could have concluded that [the defendant] was conveying facts about the plaintiff.") (citation and quotation marks omitted).

Moreover, the Second Circuit has emphasized that courts should not consider the statement in question in isolation, but must

---

[6] To the extent that the Court suggested in the May 31 Order that the classification of a defamatory statement as fact or opinion is a matter of fact for the jury to decide, the Court reaffirms its awareness that this classification is a matter of law for the Court. *See Celle*, 209 F.3d at 178 ("The court must . . . decide as a matter of law whether the challenged statement is opinion.").

analyze statements "in the context of the entire communication and of the circumstances in which they were . . . written. . . ." *Celle*, 209 F.3d at 178 (quoting *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552-53 (N.Y. 1986)); *see also Flamm v. Am. Assoc. of Univ. Women*, 201 F.3d 144, 153 (2d Cir. 2000) ("Since *Steinhilber*, the Court of Appeals of New York has consistently focused its analysis on the overall context in which the complained-of assertions were made."); *see also Dworin*, 2008 U.S. Dist. LEXIS 13655, at *11-*12 ("[I]n distinguishing between actionable factual assertions and nonactionable opinion, the courts must consider the content of the communication as a whole, as well as its tone and apparent purpose.") (quoting *Brian v. Richardson*, 87 N.Y.2d 46, 51 (N.Y. 1995)).

In particular, although the Second Circuit has emphasized that courts should "eschew any attempt . . . to reduce the problem of distinguishing fact from opinion to a rigid set of criteria which can be universally applied," *Celle*, 209 F.3d at 179 (citation and quotation marks omitted); *see also Jewell v. N.Y. Post*, 23 F. Supp. 2d 348, 376 (S.D.N.Y. 1998) ("Application of these three factors is not rigid and mechanical, and no single factor is dispositive."), the Second Circuit has set forth the following factors to guide the Court's inquiry:

> (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a

consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion.

*Kirch*, 449 F.3d at 403 n.7 (citation and quotation marks omitted).

In applying these factors in various contexts, the Second Circuit and district courts therein have further noted certain specific characteristics that distinguish fact from opinion. One such distinction relates to the timing of the statement. Specifically, "[t]he preliminary nature of reported information is a contextual factor which supports, but by no means dispositively so, a finding that the statements are ones of opinion." *Jewell*, 23 F. Supp. 2d at 379 ("In contrast to a series of articles published after exhaustive research and investigation, the statements at issue were published at the very earliest stages of an investigation."); *see also Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 155-56 (N.Y. 1993) ("In this case, the assertion that plaintiff engaged in 'corrupt' conduct in his capacity as Chief Medical Examiner cannot be treated as a mere rhetorical flourish or the speculative accusation of an angry but ill-informed citizen made during the course of a heated debate. Rather, the accusation was made in the course of a lengthy, copiously documented newspaper series that was written only after what purported to be a thorough investigation.") (citation omitted).

Another distinction courts have drawn relates to certain rhetorical "indicators" that the writer or speaker is expressing an opinion. For instance, "the use of 'appeared to be,' 'might well be,' 'could well happen,' and

'should be' . . . signal presumptions and predictions rather than facts." *Flamm*, 201 F.3d at 154 (citation and quotation marks omitted); *see also Levin*, 119 F.3d at 197 ("When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact."); *Dworin*, 2008 U.S. Dist. LEXIS 13655, at *14 ("Deutsch gives numerous indicators – e.g., 'it seemed to me . . .,' 'he didn't seem . . . ' – which signal to readers . . . that what is being read . . . is likely to be opinion, not fact.") (citation and quotation marks omitted). Similarly, "an opinion may be offered with such excessive language that a reasonable audience may not fairly conclude that the opinion has any basis in fact," such as the "type of speech often characterized as rhetorical hyperbole, parody, loose, or figurative." *Treppel v. Biovail Corp.*, No. 03 Civ. 3002, 2004 U.S. Dist. LEXIS 20714, at *38 (S.D.N.Y. Oct. 15, 2004) (citation and quotation marks omitted) (collecting cases).

Here, as set forth below, the Court has considered the Hospital's statement in context, from the perspective of a reasonable person, and finds as a matter of law that it is a statement of fact.

The Hospital's statement was published at the culmination of a government investigation of the Hospital. The tone of the statement is undeniably grave – made, in part, to evince the Hospital's "embarrassment" and "regret" – and its placement on the website of a law enforcement authority lends it the appearance of increased credibility. Moreover, the Hospital's statement does not contain any words of qualification signaling an opinion or that are at all hyperbolic. Thus, a reasonable reader could not conclude that the Hospital's statement was preliminary, speculative, or "loose." Instead, a reasonable reader would conclude that the Hospital was reporting facts adduced from a completed investigation for the serious purpose of informing the public of the reason for a settlement that could be potentially damaging to the Hospital. Therefore, the tone, purpose, and content of the Hospital's statement, taken in context and from the perspective of an average reader, demonstrate that the statement was one of fact, and not opinion.

In opposition, defendants argue that the word "misconduct" in the Hospital's statement is so vague that it cannot be considered factual. As a threshold matter, the statement explicitly defines the former executives' alleged "misconduct," *i.e.,* as conduct specifically related to "unlawful Medicaid reimbursements." Moreover, in analyzing potentially defamatory statements according to the standard the Court outlined above, the Second Circuit and district courts therein have specifically found statements about a plaintiff's conduct – including professional misconduct – to be statements of fact, and not opinion. *See, e.g., Albert v. Loksen*, 239 F.3d 256, 268 (2d Cir. 2001) ("Those accusations are more than statements of opinion about Albert's work performance; they are specific statements of fact – statements capable of objective proof – about what Albert did and did not do."); *Purgess v. Sharrock*, 33 F.3d 134, 140 (2d Cir. 1994) ("Under the circumstances, those statements were representations of fact that defamed Purgess by falsely portraying his professional conduct."); *Kelly v. Schmidberger*, 806 F.2d 44, 48 (2d Cir. 1986) (holding statement was "a factual statement, imputing to the plaintiff priests corrupt and possibly criminal conduct"); *Davis v. Ross*, 754 F.2d 80, 84 (2d Cir. 1985) ("While it is true that the mere statement of discharge from employment does not constitute libel, the *Nichols* court added that publication of a discharge would be defamatory if 'the publication contains an insinuation that the discharge was for some misconduct.'") (quoting *Nichols v. Item Publishers*, 309 N.Y. 596, 601 (N.Y. 1956));

*Whitney Info. Network, Inc.*, 2008 U.S. Dist. LEXIS 21223, at *13 ("Viewed in toto, the Court finds that although some statements appear to be pure opinion, others cannot be so categorized as a matter of law. For example, Weiss's statements that 'they have been caught with their hands in the proverbial cookie jar,' and '[w]ithout strong representation, we would have woken up to find the cookie jar empty' reasonably suggest that WIN has engaged in inappropriate or illegal conduct, an accusation that can be proven false."); *Camp Summit of Summitville, Inc. v. Visinski*, No. 06-CV-4994, 2007 U.S. Dist. LEXIS 28496, at *33-*34 (S.D.N.Y. Aug. 16, 2007) (holding that statements that one was a "'crook' who 'engaged in illegal conduct' were statements of fact, not opinion"); *Haugh v. Schroder Inv. Mgmt. N. Am.*, No. 02 Civ. 7955, 2003 U.S. Dist. LEXIS 7989, at *4 (S.D.N.Y. May 15, 2003) ("Statements to the effect that someone was discharged for 'misconduct,' or 'for lack of professional competence' or 'for cause' may . . . be actionable"). *Cf. Torain v. Liu*, No. 06 Civ. 5851, 2007 U.S. Dist. LEXIS 60065, at *6 (S.D.N.Y. Aug. 17, 2007) (finding allegedly defamatory statement to be one of opinion where, among other things, defendant "did not accuse plaintiff of committing any act or engaging in any specific conduct based on a false assertion of fact"). In the instant case, similar to the above-referenced, overwhelming number of cases holding that allegations criticizing a person's conduct can constitute statements of fact, the Court rejects defendants' contention that this case involves a statement of opinion.

Defendants also argue that the Hospital's statement is an opinion because it is accompanied by a copy of the AG complaint. However, the Court rejects this argument as inapposite. The Court is aware that "a statement of opinion that is accompanied by a recitation of the facts on which it is based. . . . is not actionable because a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture." *Whitney*, 2008 U.S. Dist. LEXIS 21223, at *9 (citation and quotation marks omitted); *see also Clark v. Schuylerville Central Sch. Dist.*, No. 98575, 2005 N.Y. App. Div. LEXIS 14804, at *2 (N.Y. App. Div. Dec. 29, 2005) ("Generally, a statement of opinion accompanied by a full recitation of the facts on which it is based will be deemed a pure opinion. . . .").[7] Although the presence of the AG complaint comprises one aspect of the contextual picture the Court has considered in determining whether the Hospital's statement was one of fact or opinion, the Court finds, as discussed *supra*, that the Hospital's statement was one of fact. Thus, these cases, which pertain at the outset to "*statement[s] of opinion* accompanied by a full recitation of facts," *id.* (emphasis added), are inapposite.[8]

_____

[7] As a threshold matter, the Court is unpersuaded that the AG complaint represents such a "recitation of facts" because complaints are, by definition, merely a recitation of unproven allegations. Indeed, the Hospital explicitly refused to admit that the allegations were true in the settlement agreement.

[8] Further, even assuming *arguendo* that the Hospital's statement were one of opinion, the Court finds that the statement implies that it is based – at least in part – on knowledge of facts undisclosed to the reader and, therefore, is actionable. "Though some statements may be characterized as hypothesis or conjecture, they may yet be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader." *Levin*, 119 F.3d at 197; *Whitney Info. Network, Inc.*, 2008 U.S. Dist. LEXIS 21223, at *8-*9 ("In making this determination, the Court must distinguish between a statement of opinion that implies a basis in facts which are not disclosed to the reader or listener and a statement of opinion that is accompanied by a recitation of the facts on which it is based or one that does not imply the existence of undisclosed underlying

## C. Intent

With respect to the intent element of Pisani's defamation claim, defendants argue that because Pisani was a limited purpose public figure, plaintiff must establish that defendants acted with actual malice in issuing the Hospital's statement. Alternately, defendants argue that even if Pisani were a private figure, the Hospital's statement addressed a matter of public concern and, therefore, plaintiff must establish that defendants acted with gross irresponsibility. Defendants argue that plaintiff cannot demonstrate that they acted with actual malice or gross irresponsibility and, thus, cannot meet the intent element. In opposition, Pisani argues that he can demonstrate intent under either standard.

As set forth below, the Court finds that Pisani was not a limited purpose public figure. Instead, the Court finds that plaintiff was a private figure and that the Hospital's statement addressed a matter of public concern. Further, after careful review of the record, the Court finds that material issues of fact remain regarding whether defendants acted with gross irresponsibility in issuing the statement.

### (1) Pisani is Not A Limited Purpose Public Figure

As a threshold matter, as with the classification of an allegedly defamatory statement as one of fact or opinion, "[w]hether a plaintiff is a public figure is a question of law for the court." *Celle*, 209 F.3d at 176; *see also Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F. Supp. 661, 666 n.3 (S.D.N.Y. 1991) ("Whether or not a person or an organization is a public figure is a question of law for the court to decide."). As set forth below, the Court finds that Pisani is not a limited purpose public figure, as defendants assert.

"In *Lerman v. Flynt Distributing Co., Inc.*, 745 F.2d 123, 136-37 (2d Cir. 1984), cert. denied, 471 U.S. 1054 . . . (1985), [the Second Circuit] set forth a four part test for determining whether someone is a limited purpose public figure:

> 'A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.'"

*Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 617 (2d Cir. 1988), *cert. denied* 488 U.S. 856 (1988) (quoting *Lerman*, 745 F.2d at 136-37).

Here, in support of their assertion that Pisani was a limited purpose public figure, defendants cite various facts that show that plaintiff was, generally speaking, "a limited purpose public figure with respect to his position and stature in the New York metropolitan area health care community."

---

facts.") (citation and quotation marks omitted). Here, the Hospital's statement refers to "actual damages conservatively estimated by the Attorney General's Office." Thus, the statement suggests that the Hospital is privy to facts regarding what "actually" occurred that are distinguishable from the facts publicly reported. The Court finds that this implication of undisclosed facts would be sufficient to make the Hospital's statement actionable even if it were one of opinion.

(Defs.' Mem. at 14.) Defendants emphasize, for instance, that plaintiff had gained public prominence during his employment subsequent to working at the Hospital. (Defs.' Mem. at 14.) However, because plaintiff's purported prominence was wholly unrelated to the topic of the Hospital's statement, the Court finds defendants' argument inapposite and concludes that Pisani was not a limited purpose public figure.

In particular, as the Second Circuit noted in *Contemporary Mission, Inc.* in the course of analyzing Supreme Court cases pertaining to limited purpose public figures, the "key inquiry in each case concerned 'the nature and extent of [the] individual's participation in the *particular controversy giving rise to the defamation.*" 842 F.2d at 617 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974)) (emphasis added); *see also Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1168 (E.D.N.Y. 2003) ("The Court agrees that Perks was a limited purpose public figure – in regard to this particular controversy – by the time that Scarpati-Reilly published her open letter about his lawsuit."); *Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248, 252 (S.D.N.Y. 2001) (finding plaintiffs were not limited purpose public figures as a matter of law where record showed, at most, that plaintiffs injected themselves into a public controversy that was "not the subject of the alleged defamatory statements nor reasonably related thereto"); *Naantaanbuu v. Abernathy*, 816 F. Supp. 218, 225 (S.D.N.Y. 1993) ("Under the facts of this lawsuit, however, the controversy and the voluntary behavior are not closely connected enough to render Naantaanbuu a limited purpose public figure. . . . That she sought out the press on matters completely unrelated (running for office, bringing a lawsuit, and defending herself after the Book was released) is immaterial.").

Defendants have failed to cite any facts showing that Pisani's prominence was related to the topic of the Hospital's statement. Indeed, defendants' facts merely demonstrate, at most, that Pisani gained prominence years after leaving the Hospital. Thus, the Court finds as a matter of law that plaintiff was not a limited purpose public figure according to the Second Circuit standard set forth above.[9]

### (2) Pisani is a Private Figure and the Hospital's Statement Related to a Matter of Public Concern

Defendants also argue that "even if plaintiff was not a limited purpose public figure, because the Statement . . . related to a matter of public concern, plaintiff must still prove, by a preponderance of the evidence, that defendants were 'grossly irresponsible' in adopting the Statement." (Defs.' Mem. at 20.) In connection with that standard, defendants contend that Pisani, as a matter of law, cannot show defendants' gross irresponsibility.[10] For

---

[9] The Court is aware of the cases defendants cite in which courts found a plaintiff to be a limited purpose public figure based merely on general prominence in the community, as defendants urge the Court to find here with respect to plaintiff. *See, e.g., Fodor v. Berglas*, No. 95 Civ. 1153, 1995 U.S. Dist. LEXIS 12245, at *14 (S.D.N.Y. Aug. 24, 1995). However, given the Second Circuit's explicit holding in *Contemporary Mission, Inc.*, discussed *supra*, and the overwhelming number of district courts in this Circuit that have followed that holding, the Court concludes that a plaintiff's prominence must be substantively related to the "particular controversy giving rise to the defamation." *Contemporary Mission, Inc.*, 842 F.2d at 617.

[10] "Although the question of gross irresponsibility is not solely for the court, a court may award summary judgment on the issue where a sufficient showing is made for, or an insufficient showing is made against, the summary judgment motion." *Abbott v. Harris Pubs., Inc.*, No. 07 Civ. 7648, 2000 U.S. Dist. LEXIS 9384, at *23 (S.D.N.Y.

the reasons set forth below, the Court disagrees and finds that the question of defendants' gross irresponsibility constitutes a genuine issue of material fact warranting a trial.

As the Second Circuit has confirmed, "[t]he New York Court of Appeals has held that 'where the content of [an] article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover' if he or she can establish 'by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.'" *Albert*, 239 F.3d at 269 (quoting *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 199 (N.Y. 1975)).[11] Specifically, the Second Circuit considers the following factors to determine whether a defendant acted in a grossly irresponsible manner:

> whether [defendant] (1) followed "sound journalistic practices" in preparing the allegedly defamatory article;

> (2) followed "normal procedures," including editorial review of the copy; (3) had any reason to doubt the accuracy of the source relied upon and thus a duty to make further inquiry to verify the information; and (4) could easily verify the truth.

*Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997) (quoting *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 924-25 (2d Cir. 1987)). Here, defendants argue that they responsibly relied on the results of the AG investigation in making the Hospital's statement. Specifically, defendants state that "as a result of participation in the multi-year investigation by the AG of the Hospital's billing practices, the production of tens of thousands of documents and interviews and meetings, the Hospital's senior representations [sic] were fully aware of the facts relating to the violations of the 60-hour rule." (Defs.' Mem. at 20.) However, as set forth below, defendants have failed to persuade the Court that their reliance on the results of the AG investigation was not grossly irresponsible as a matter of law.

As a threshold matter, "'[o]rdinarily it is grossly irresponsible to make a defamatory statement knowing that it is false or while highly aware that it is probably false.'" *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 376 (S.D.N.Y. 2006) (quoting *Konikoff*, 234 F.3d at 104) (noting that knowingly making a false statement may not be actionable if defendant follows proper standards for information dissemination); *see also Sepenuk v. Marshall*, No. 98 Civ. 1569, 2000 U.S. Dist. LEXIS 17823, at *8 (S.D.N.Y. Dec. 8, 2000) (denying summary judgment on defamation claim because, among other things, plaintiff "has put forth evidence which could support a finding that the Marshalls' statements . . . were knowingly false, thus evincing gross

---

July 7, 2000). As set forth *infra*, however, the Court finds that summary judgment under the circumstances of this case is inappropriate.

[11] Although *Chapadeau* addressed media defendants, the Second Circuit has noted that "[c]ourts applying New York law have . . . uniformly applied Chapadeau to cases involving non-media defendants, at least where the communication at issue admits of measurement by the Chapadeau standard." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 101 and n.8 (2d Cir. 2000) (applying gross irresponsibility standard to non-media defendant) (collecting cases). Defendants do not dispute that *Chapadeau* would set forth the appropriate standard for gross irresponsibility in this case. The Court agrees.

irresponsibility"). Here, Pisani has pointed to evidence that, viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, calls into question whether defendants knew that portions of the Hospital's statement were false. For instance, in a letter from the attorney for CHAPS and SIUH to the AG, dated May 7, 2003 (the May 7 Letter), the Hospital stated:

> Based on our review of relevant documentation and our analysis of the medical clinics' hours of operation . . . we believe that, during the time period in question, neither CHAPS nor SIUH engaged in wrongful or inappropriate conduct aimed at increasing utilization at all of its part-time medical clinics by encouraging active disregard for the "60-hour rule." To the contrary, the evidence reveals an on-going effort to assess and encourage compliance. . . . Moreover, neither CHAPS nor SIUH knew, nor had reason to know or believe, that non-compliance with the "60-hour rule" could lead to a claim that services provided in excess of the hours limitation were not reimbursable, let alone to an assertion of possible institutional criminal wrongdoing.

> \*\*\*

> Indeed, while personnel were aware that some clinics may have had problems with the "60 hour rule," they believed they were acting in good faith, and they had no reason to believe that non-compliance exposed the institutions to a civil recoupment claim, let alone to possible criminal liability.

> \*\*\*

> The relevant contemporaneous documentation and other information we have gathered concerning the efforts made by CHAPS (and SIUH) with regard to the "60 hour rule" confirms that CHAPS and SIUH personnel worked in good faith to assess and then encourage compliance with the "60-hour rule" during the time period in question.

(Pl.'s Exh. 11.)

Further, in relation to a prior investigation of the Hospital by the AG, the Hospital engaged an independent monitor – HECOR – to oversee and independently report to the AG regarding the CHAPS clinics. (Defs.' 56.1 ¶ 36.) In the May 7 Letter, SIUH admitted that HECOR had found that "certain clinics had been operating in excess of 60 hours per month." (Pl.'s Exh. 11.) However, SIUH also stated that "HECOR's overall conclusion was that: '*CHAPS/SIUH operates its part-time clinics in general accordance and compliance with all applicable laws, rules and regulations*.'" (Pl.'s Exh. 11) (emphasis in original) (citing HECOR report).

A reasonable jury could conclude that this essential disavowal of misconduct by SIUH – including a disavowal of misconduct by its personnel – based both on the Hospital's investigation and on that of an independent monitor, contradicts the Hospital's statement and is evidence of the Hospital's knowledge of the falsity of such statement. In short, in

conjunction with the overall record in this case, including Fried's testimony – recounted *supra* – that "it was far more beneficial to the hospital to enter into that settlement agreement than litigate and perhaps ultimately be liable for far more in damages after a far uglier litigation than what ultimately occurred," the content of the May 7 Letter creates an issue of fact regarding the Hospital's knowledge that its statement was false or at least probably false.

The Court is aware that a "number of New York cases have dealt with defamation claims arising out of a corporate employer's publication of the results of an internal investigation that the employer had commissioned from lawyers because the employer was concerned about potential employee misconduct. In each case, the courts have found that the company's reliance on a thorough, responsible investigation negated the existence of gross irresponsibility as a matter of law." *Kamfar v. New World Rest. Group, Inc.*, 347 F. Supp. 2d 38, 47 and n.46 (S.D.N.Y. 2004) (collecting cases). However, as set forth below, to the extent that defendants argue that these cases are analogous, the Court disagrees and finds that these cases do not provide a basis for the Court to find that defendants' reliance on the AG investigation was not grossly irresponsible as a matter of law.

As a threshold matter, the investigation upon which defendants rely was not conducted or "commissioned" by the Hospital or its agents, but rather was conducted by a third party. Where courts have found that reliance on an independent investigation negates the existence of gross irresponsibility as a matter of law, the investigations were commissioned by the entity that made the allegedly defamatory statement. *See, e.g., Konikoff*, 234 F.3d at 103 ("There also is no indication that Prudential was grossly irresponsible in disseminating the statements.

On the contrary, it was plainly reasonable for Prudential to publish the full text of the independent report it had commissioned. . . ."); *Mott v. Anheuser-Busch, Inc.*, 910 F. Supp. 868, 875-76 (S.D.N.Y. Dec. 29, 1995), *aff'd* No. 96-7114, 1996 U.S. App. LEXIS 26083 (2d Cir. Oct. 3, 1996) (finding publication not grossly irresponsible where "investigative team was comprised of both Anheuser-Busch employees from the legal and environmental departments and outside legal counsel from three different law firms"). Here, had defendants relied on the investigation they commissioned of HECOR and the Hospital's lawyers, as described *supra* and in detail in the May 5 Letter, cases such as *Konikoff*, *Mott*, and *Kamfar* would have provided a useful analogy. However, defendants relied instead on the investigation of a third party whose findings differed sharply from those of HECOR and the Hospital's lawyers. Under these circumstances, the Court cannot conclude that defendants' reliance on the AG investigation was not grossly irresponsible as a matter of law.

Moreover, in applying the *Chapadeau* standard, the Second Circuit has held that "[a] publisher will not be liable for an article later shown to be false if it relies upon the integrity of a reputable author and has no serious reason to question the accuracy of the information provided by that author." *Chaiken*, 119 F.3d at 1032; *see also Tzougrakis v. Cyveillance, Inc.*, 145 F. Supp. 2d 325, 331 (S.D.N.Y. 2001) ("In Karuduman, the New York Court of Appeals held that a republisher cannot be held grossly irresponsible in the absence of facts that would arouse the suspicions of a careful publisher or that would give cause for further inquiry.") (citation and quotation marks omitted); *Weber v. Multimedia Entm't, Inc.*, No. 97 Civ. 0682, 2000 U.S. Dist. LEXIS 5688, at *33 (S.D.N.Y. May 2, 2000) ("Thus, it is appropriate that the producers of a talk

show not be required to investigate a potentially defamatory statement made by a guest appearing on their show unless there are substantial reasons to question the accuracy of the guest's statements."). Here, even assuming *arguendo* that defendants could rely on the AG's investigation in issuing the statement, a reasonable jury could find that the sharply divergent findings by HECOR and the Hospital's own legal team raised a "serious question" in the Hospital's view about the accuracy of the AG's investigation and, therefore, warranted further inquiry by defendants. However, the record contains no evidence such inquiry was conducted. On the contrary, Fried testified that "the decision that the Board made was that it was far more beneficial to the hospital to enter into that settlement agreement than litigate and perhaps ultimately be liable for far more in damages after a far uglier litigation than what ultimately occurred." Under these circumstances, the Court concludes that the question of whether defendants acted with gross irresponsibility in issuing the Hospital's statement is a material issue of fact that warrants a trial.

### D. Special Damages

As of May 17, 2005, Pisani was employed by the Westchester Medical Center ("WMC"). (Defs.' 56.1 ¶ 126.) On May 18, 2005, Richard Berman ("Berman"), the Chairman of the WMC Board, asked plaintiff to resign. (Defs.' 56.1 ¶ 149.) Pisani claims that he was asked to resign from WMC because of the Hospital's statement. Defendants argue that the Hospital's statement was not the proximate cause of Pisani's departure from WMC and, therefore, plaintiff cannot, as a matter of law, meet the damages element of a defamation claim. For the reasons set forth below, the Court disagrees with defendants and finds that a genuine issue of material fact remains regarding the proximate cause of Pisani's departure from WMC.

As the Second Circuit has stated, "[s]pecial damages consist of 'the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation[.]'" *Celle*, 209 F.3d at 179 (citing *Matherson v. Marchello*, 100 A.D.2d 233, 235 (N.Y. App. Div. 1984)). In order to demonstrate a causal connection between the Hospital's statement and Pisani's departure from WMC, plaintiff has provided several pieces of evidence, including the following testimony of Berman regarding the reasons WMC asked Pisani to leave: (1) "I think that would have been a conversation that either I said or implied in my reading of the AG's report and the press release and hearing the report that the AG's office said it was bullet proof, and the Staten Island statement that officers had conducted misconduct" (Berman Dep. at 44); (2) "I do not know if I read [the Hospital's statement]. There are parts of it that are familiar. So, I would say I read part. But I don't know if I read it from Exhibit 1 [which was the Hospital's statement], or it came in another form, or it was part of a the [sic] complaint itself, or part of whatever. So, I read a lot about his. But whether it was in Exhibit 1 or not, I don't know." (Berman Dep. at 45); and (3) Q: On May 18th, '05, did you believe that if the Attorney General issued a complaint alleging criminal wrong doing [sic], that that was the equivalent of a person having committed a crime? A: The combination of that and the settlement, and the Staten Island people, apologizing for misconduct, and the Attorney General saying it was bulletproof, yes." (Berman Dep. at 66). In the context of this case, and after careful review of the entire record, the Court finds that these statements of Berman are sufficient to create a genuine issue of material fact regarding special damages. In other words, a reasonable factfinder could determine that Pisani lost his

job at WMC because of the Hospital's statement.[12]

### V. CONCLUSION

For the foregoing reasons, the Court denies defendants' motion for summary judgment in its entirety.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 15, 2008
Central Islip, NY

* * *

The attorneys for the plaintiff are Jane Bilus Gould, Esq. and Jonathan Lovett, Esq. of Lovett & Gould at 222 Bloomingdale Road, White Plains, New York, 10605. The attorneys for defendants are David O. Simon, Esq. and Tracey A. Cullen, Esq. of Epstein Becker and Green, P.C. at 250 Park Avenue, New York, New York 10177.

---

[12] Defendants also move for summary judgment dismissing all claims against Ferreri on the grounds that the record does not evince his personal involvement in this action. However, in light of Ferreri's active involvement in crafting the Hospital's statement – and, especially, evidence of his focus on shifting blame to "former executives," as discussed *supra* – the Court declines to dismiss the claims against Ferreri. In light of the record in this case, the extent of his involvement is more properly a question of fact for the jury.